## MARTIN *vs.* MARTIN, ADM'R OF MARTIN.

1. A bill, which seeks to establish, against several persons, demands which are similar— based upon the same facts, and growing out of, and depending upon the same principles, is not multifarious.
2. An administrator cannot sue his co-administrator at law.
3. Where a father upon the marriage of his son, delivers to him a slave without any ex-

planation *at the time* of his intention whether it is a gift or a loan, the presumption of law is that it is an absolute gift: and where the property thus delivered, remains a considerable length of time in the possession of the son, it should require the clearest, most direct and uncontradictory evidence to rebut this presumption.

[This cause was argued, and submitted to the court, at the January term, 1849, and the following opinion of the court was delivered by judge Napton: at the same term, the appellant's counsel filed the annexed petition for a rehearing. Before the petition for a rehearing was heard, judges Scott and McBride, were superceded by judges Ryland and Birch. A rehearing was granted, and the first decision of the court was not fully sustained. The first and second points above, are decided by the original opinion delivered by judge Napton, and concurred in, by the last opinion. The third point is established by the last opinion delivered by judge Birch.—REPORTER.]

## APPEAL FROM CALLAWAY CIRCUIT COURT.

### STATEMENT OF THE CASE.

On the 25th day of September, 1846, Samuel Martin, administrator of the estate of Russell Martin, deceased, filed in the office of the clerk of the circuit court of the county of Calla. way, his bill in chancery against William R. Martin, his co-administrator and others, defendants in said suit.

The bill charges, that about the year 1820, Russell Martin, the intestate, resided in the State of Kentucky, that he had a considerable family of children, male and female, and was possessed of a considerable number of negroes; that it was his custom, upon the marriage of any of his children, to loan to such children, a negro servant to assist them in their domestic affairs; that some of the children died before said Russell Martin, and the negroes in their possession were returned to him, and with their increase remained with him until his death; that on the death of Russell Martin, Samuel and Wm. R. Martin became his administrators and administered upon his estate; that W. R. Martin and John Martin, claimed to hold the negroes so loaned to them with their increase, as their own property, as a gift from said Russell Martin, and refuse to render up the same to the administrators, to be administered as the estate of said Russell Martin. Samuel R. Martin applies to the circuit judge, sitting in equity, to interpose the power of the court, to remove the impediments from the administration, and prays that all the heirs and distributees of Russell Martin may be made parties defendants to the bill, and answer upon oath of their knowledge or belief whether the said slaves, furnished to them or their ancestors, were a gift or a loan—and that the slaves in the possession of W. R. Martin and John Martin or any of the heirs and distributees, if found to belong to the estate of Russell Martin, be decreed to be delivered up to the administrators of Russell Martin, to be administered as the property of Russell Martin, dec'd. Knowledge and intentional fraud is charged against John T. and W. R. Martin. W. R. Martin then filed his demurrer to said bill; amongst various reasons—for improper joinder of parties, want of jurisdiction, multifariousness, ample and complete remedy at law.

John Martin also filed his demurrer to the said bill, for want of equity and improper joinder of parties.

The complainant joined in the demurrers. The court overruled the demurrer as to W. R. Martin, and sustained the demurrer as to John Martin.

W. R. Martin then filed his answer to said bill, portions of which he admits. He admits that he refused to administer himself, and objected to said complainant administering upon said Hannah and her children, the negroes in his possession, charged in said bill to belong to the estate of Russell Martin. He admits that the several children, except herself, took possession of the said several negroes, as mentioned in said bill, but denies that they were taken

possession of as loans, but were taken possession of at the several times mentioned in said bill as gifts by the said Russell Martin to them, as he is informed and believes. He denies that the negroes that were returned to Russell Martin, after the death of his children, were returned as the property of Russell Martin, but for other reasons; that he received said Hannah Oct., 1826, then about 8 years of age, and raised and supported her and her children to the present time ; that he has been in peaceable and undisturbed possession of said Hannah as his own property ever since, and of her said four children since they were born; that the said Russell Martin never did in his life time, after this respondent took possession of said Hannah, claim said Hannah or any of her children as his property, but, on the contrary, repeatedly told this respondent that he intended Hannah to be considered as a gift, and that he did not intend that said Hannah or any of her children should be taken from him ; and this respondent further answering, expressly denies that he ever received or took possession of said Hannah as a loan, but took possession of her as a gift from said Russell Martin, and expressly avers, that said Russell Martin, at the time he delivered said Hannah to this respondent, made a gift of her to this respondent, and so expressed himself at the time and often afterwards, and as above stated, has never claimed her or any of her children since.

The complainant filed his replication to the answer of W. R. Martin.

Then follows the answer of Peggy Martin, the widow of Russell Martin, who was made a party to the bill. Among other things, she states that to his daughter Nancy Vaughan Magill, Russell Martin loaned a negro girl named Jinny. To his daughter Lucy Dudley Lawrence, said Russell Martin loaned a negro girl named Annie. To his daughter Fanny Vaughter, said Russell Martin loaned a negro girl named Margaret. To his son John Martin, said Russell Martin loaned a negro girl named Caroline. To his son W. R. Martin, said Russell Martin loaned a negro girl named Hannah, which said loans took place in the State of Kentucky. After the removal of Russel Martin to this State, he loaned his son Samuel Martin a negro girl named Sally. That she has often heard her husband say before and after the loans to said children, that he intended to loan to his said children the said negroes; that he had not given and never intended giving negroes to any of his children, until after his death, and she has no hesitation in saying that such was the intention of the said Russell Martin, and the understanding of all the children: that after the death of Nancy V. Magill, and after the said Jinny had remained with the husband of the said Nancy, several years, said Russell took back the said Jinny and held her and her increase until the time of his death, as his own property ; and also after the death of Fanny Vaughter, said Russell Martin took back, and claimed, and held as his own property until his death, the negro girl Margaret and her increase : that soon after the death of Lucy Dudley Lawrence, James Lawrence, her husband, returned the negro girl Annie to Russell Martin, said Annie then being sick, and after the recovery of said Annie, Russell Martin sent back the said Annie, to attend to and take care of the children of said Lucy Dudley Lawrence, but as the property of said Russell Martin ; and she further states that Woodford, one of the children of the negro girl Caroline, loaned by Russell Martin to his son John, was brought to Russell Martin when an infant, and raised by this respondent, as the property of the said Russell Martin ; and the negro girl Sarah, another of the increase of the girl Caroline, was sold as stated in said bill to Richard Swan, the consent of Russell Martin being first obtained to said sale. This respondent states, that to the best of her recollection and belief, never at any time before the death of the said Russell Martin, did any of his children claim any of the negroes so loaned or their increase as the absolute property of any of said children. She makes these statements from her absolute knowledge of the intentions of the said Russell Martin, respecting said property before and during the time said negroes were so loaned by her late husband to his said children.

Then follows the answers of James Lawrence and wife, Richard Henry Vaughter, Thomas Lawrence, Wm. M. Lawrence, Peggy Lawrence, by her guardian Jas. Lawrence, Houff and wife, Redman and wife, declaiming a gift of any of the negroes of Russell from their own knowledge and belief, or from informations derived from their ancestors, and claiming only as

the heirs and distributees of Russell Martin. Replication filed to the above answers by complainant.

John T. Martin, then, by leave of the court, filed his answer to the complainant's bill, and for answer thereto, says, that at the time of filing said bill, he was in possession of said negroes as stated in said bill, and since the commencement of said suit, has delivered up said negroes to the administrator of the estate of Russell Martin, deceased, and disclaims all right except as distributee. And afterwards, on Tuesday the 18th day of April, 1848, the court having taken the cause under consideration, and being now fully advised, do order and decree that the said complainant, Samuel Martin and W. R. Martin, administrators of Russell Martin, proceed to inventory the negroes in their possession, specified in the bill of chancery of Samuel Martin, adm'r., &c., against W. R. Martin and others, and proceed to administer upon the negroes, yet unadministered, as belonging to the estate of Russell Martin, deceased; and that the said Samuel Martin and Wm. R. Martin, as administrators as aforesaid, take into their possession the slaves in the possession of Wm. R. Martin, mentioned in said bill, to wit: Hanna and her children, Samuel, Sanford, Buford and Anthony; and that the said defendant, Wm. R. Martin, is decreed and required to give up to the said Samuel Martin and Wm. R. Martin the said slaves, and that the said Samuel Martin and Wm. R. Martin proceed to inventory the said slaves, and administer the same as the property of Russell Martin, deceased; and it is further ordered and decreed by the court, that the complainant recover against the said defendant, W. R. Martin, his costs and charges in this suit expended, and that he have execution.

The defendant produced his motion to set the decree aside, which was ordered to be filed, and thereupon the court overruled the same.

The complainant read the bill, exhibits, and all the answers except W. R. Martin's whose answer was read by him, when the complainant introduced the following testimony:

Mrs. Eustin Craig stated, that some fifteen or sixteen years ago, she had a conversation with W. R. Martin in relation to disposition of slaves by his father, which took place at the house of witness, in the presence of Moore, (the assessor) and the husband of witness. W. R. Martin asked if Mr. Craig paid taxes on the negro the father of witness gave her at her marriage: witness replied in the affirmative: W. R. Martin said he thought the way his father done was the best: his father loaned a negro to a child and paid taxes on it: if the negro died it was father's loss.

Mrs. Snell stated, that she has been acquainted with W. R. Martin for 13 years; lives in the same neighborhood; husband of witness has been dead 12 years; heard a conversation between W. R. Martin and her husband relative to the negro girl that Mr. Magill had; W. R. Martin said his father did not give his children negroes, that he loaned them; at his father's death they would come back to his estate; can't remember how the conversation commenced; Mrs. Magill had lived in Missouri, and was then dead; witness is perfectly satisfied that W. R. Martin made the statement which took place some time before the death of her husband.

Samuel Martin, jr. stated, that he heard a conversation between his father, John T. Martin, and uncle, W. R. Martin, which took place about 4 years since, and before the death of his grandfather, R. Martin. Witness and his father were going along the road by the house of W. R. Martin with a wagon; W. R. Martin got in the wagon and rode some little distance, and said it was a good idea the way his father let his children have the negroes, for if he had given them, the children might have spent them; can't recollect the particulars, but W. R. Martin, said it was a mighty good plan, for some of the sons or sons in law might have spent them.

Complainant put the following question:

Did you hear your father say any thing about your grandfather owning Caroline before the death of Russell Martin? (Objected to by W. R. Martin.) Overruled and exceptions taken.

Witness then stated, that he had heard his father say that the negroes were grandfather's; that they had been loaned to him, and that they belonged to the old man.

A. C. Hawkins, another witness, stated, that he was acquainted with Russell Martin and his family; lived in old man Martin's family in Kentucky a short time before he came to this county, and came out here with the old man, which was in 1826.

Witness was asked if he heard a consultation between Russell Martin and John T. or Magill, in relation to negroes, which was objected to ; objection overruled, and W. R. Martin excepted.

Witness then said he heard a conversation between the old man Martin and Magill, sometime after the witness came to this county, and after the death of Mrs. Magill ; Magill had a girl of old man Martin's in his possession when Magill started to Kentucky; he wanted to take the negro with him ; old man Martin objected, because he said the negro was his. He said if Magill would leave his child with him, he would raise it, and at his, old man Martin's, death she should have an equal portion of his estate ; but if he, Magill, would take the child, he should not take the negro ; don't recollect of hearing Magill claim the negro ; don't recollect that I ever heard the old man, in the presence of either of the other children, claim the negro. I have had conversation with all the children of Russell Martin, and always understood from all of them, that the negroes would be equally divided between them at the death of the old man.

Joseph Faber, another witness, stated, that he was acquainted with W. R. Martin. Witness had a conversation with W. R. Martin in relation to the negroes that came to him from the old man Martin, which took place several years before the death of his father. W. R. Martin told me they were loaned to all the children, and the old man paid the taxes on them. This conversation took place between this place and the forks of the road going to Mr. McKinney's. There were executions against John T. Martin, and witness wished to know why they were not levied on the negroes in John's possession. W. R. Martin said, the old man had only loaned the negroes to John T. Martin. He further said, the old man had not given any of the children the blacks ; he had only loaned them.

Hugh Twicher, another witness, states that he had a conversation with W. R. Martin at his house; conversation related to John T. Martin's negroes. He said Capt Jamison had said five years possession would give John. T. Martin a title to the slaves; something said about taxes. I was constable at the time, and had executions against John T. Martin, which I think gave rise to the conversation. John T. Martin had negroes in his possession. I never levied an execution on the negroes of John T. Martin. Witness was asked what John T. Martin had said to him about the negroes before the old man's death. Objected to by W. R. Martin ; overruled and exceptions taken. John T. Martin told me he had some personal property, and some negroes too. He gave up the personal property afterwards. When I went there nothing was said about negroes, as plaintiff had directed me not to levy on negroes. I had executions in my hands all the time I was constable.

Upon cross examination, witness said he made the money upon all the executions against John T. Martin but one ; that was returned not satisfied.

Matthew Scott, another witness, states, that he was acquainted with Russell Martin and his sons. I was at Russell Martin's, and conversation arose between Russell Martin and W. R. Martin in relation to the slaves in W. R. Martin's possession. W. R. Martin was not satisfied with the right to the negroes. The old man said, if you don't want to take care of the negroes and raise them, send them home. I don't recollect that W. R. Martin answered it; both seemed to be in a fret and hurt. This took place not very long before the old man's death, less than two years. W. R. Martin said he was not willing to feed and raise the negroes for the rest. The old man replied, if he was not willing, send them home.

Richard Swan, another witness, said, I bought a negro girl of John T. Martin, named Sarah, in the winter or spring of 1844 ; the old man Martin and John T. Martin both signed the bill of sale. I had several conversations on the subject with W. R. Martin ; the last was about the time I was trading for the negro. I told W. R. I was afraid of the right of John T. to the negro. When we were on a trade, John T. said his right was good ; so did W. R. Martin.

I told .W. R. Martin I had talked with certain counsel on the subject, and told him John T. held by peaceable possession; he said five years gave right, but the old man paying the taxes on the negroes, done away with or interrupted that possession, and that he advised me to have the old man's name to the bill of sale. W. R. Martin said, if that was the case, he would give in his negroes from that time himself, even if the old man did assess them. He said no more about the title. The reason I talked with W. R. was, I had been told by John T. several times, that he held the negroes by peaceable possession, and counsel having advised me, I don't know that W. R. Martin said he held his negroes by peaceable possession. W. R. Martin did not say that either he or John held by·gift.

Here the complainant offered to prove that it was a matter of public notoriety in the neighborhood, ·that the negroes belonged to the old man Martin: objected to by defendant; objection overruled and exceptions taken.

Witness said, I heard that the old man claimed the negroes when I first moved into the neighborhood; that John T. Martin's negroes were not responsible for his debts, and that they all held the negroes alike. W. R. Martin moved into the neighborhood seven or eight years ago. It is a matter of public notoriety since his removal into the neighborhood.

Here complainant identified the tax books by the clerk of the county court, and offered to read them in evidence. Objected to by defendant; objection overruled, and exceptions taken.

Complainant proved by the tax books that from the year 1828 to the year 1842, Russell Martin gave in from 11 to 17 slaves, W. R. Martin from 2 to 3, Samuel Martin 1, and John T. none. The defendant, W. R. Martin, showed by the tax books, that from the year 1843 to the year 1845, Russell Martin assessed from 16 to 19 slaves, and· W. R. Martin from 4 to 5, Samuel and John T. none; and also showed by said tax books, that in the year 1846, W. R. Martin assessed 9 slaves.

Complainant then introduced Gideon Gaines, who said, twelve or fifteen years ago, I had a conversation with W. R. Martin in relation to a father giving property to his children. W. R. Martin spoke of his father's giving him a girl, and said it was nothing but right that parents should do as they pleased with their own property during their life time. He said nothing about a loan. He did not say whether the girl was a gift or loan.

A. C. Hawkins said, the old man had a good many negroes when he came to this country, but don't know the number. Sam'l. Martin got a slave by his wife, (which was objected to, overruled and exceptions taken.) Said slave is dead. When John T. Martin came to this county, if he had any negroes they were Caroline and her children. He had no others.

Mrs. Elizabeth Swan, another witness said, I am the wife of Richard Swan, jr., and I was at the house of Russell Martin about five years ago, when the assessor came along, and heard a conversation between Russell Martin and W. R. Martin. The old man gave in his negroes and W. R., Samuel, and John T. Martins. W. R. Martin complained and objected, but the old man said, "Billy they are my negroes, and I will do as I please with them." I also heard a conversation between my father and W. R. Martin, in relation to the negroes about four years ago. W. R. Martin was angry and said his father would give in the negroes and he had also given them in. W. R. Martin was asked what he had to show for them? He said nothing but peaceable possession for a long number of years, and he would hold them in spite of the old man. My father said he could not upon that ground.

Upon cross examination witness said, he had the negroes in possession for a number of years, don't remember the length of time. W. R. Martin said, he had often talked to his father about them, but he contended they were his. I did not hear W. R. Martin say any thing about a gift in that conversation. He was angry because his father gave the negroes in and claimed them.

Richard Swan jr. said, I never heard a conversation at my house between old man Edmondson and W. R. Martin in relation to the negroes. I heard W. R. Martin and my father, close at father's house, have a conversation in relation to negroes. John T. Martin was owing father and he was talking about getting a transcript. W. R. Martin said that a piece of his land

was in John's name and would be subject to the lien if the transcript was taken, but told father to levy on John T. Martin's negro Sarah, and sell her, that John T. would hold the negro on account of the possession in spite of his father; he W. R. Martin intended to hold his in that way. Complainant enquired of witness, was it generally understood in the neignborhood that said negroes were loaned to W. R. Martin? Objected to by W. R. Martin, objection overruled and exceptions taken.

Witness said it was the general opinion in the neighborhood, that the negroes belonged to old man Martin. In the conversation before related, W. R. Martin wished my father to levy on the negroes and said John T. Martin had a good right on account of peaceable possession. My father said he would not do it, for John had no right to the negroes. W. R. Martin had a negro woman named Winny who had two children, one about four years old, the other younger, a negro man Lewis that he sold a few years ago and the woman Hanna and her children.

Upon cross examination, W. R. Martin said he intended to hold the negroes in the same way that John held his.

Mrs. Nancy Swan said, I am acquainted with W. R. Martin, and heard a conversation between him and my husband. Can't say positively as to the time, but somewhere within four or five years back. My husband was about buying a negro (Sarah) of John T. Martin and did not like to take the right of John. W. R. Martin said, he would be in no danger in buying the negro, for five years peaceable possession gave a right to the negroes. My husband told him that Capt Jamison said, the old man's paying the taxes on the negroes interrupted he possession. W. R. Martin said, he would give in his own negroes, even if the old man did from that time.

Harvey Scott said, I was present when Mr. Swan was trying to buy the negro, Sarah. John and the old man Martin were present. W. R. Martin objected to the witness detailing the conversation as he was not present; objection overruled and exceptions taken. Swan told the old man that he, Swan, had found out that there was a difficulty about the title, and if he bought the girl, both he, the old man Martin and John must sign the bill of sale. The old man said they were his negroes, and he would make the title. John made no reply. It was Sarah.

W. R. Martin here offered to prove, that while John T. Martin was in possession of the negroes, he said they were his, and that the old man had given them to him. Objected to by complainant; objection sustained and exceptions taken.

McKinney was acquainted with Russell Martin and his children for some time. W. R. Martin had a woman and a boy, and children besides those that came from his father. John T. Martin had no negroes except those that he got from his father. The old man had several negroes besides those in the hands of his children when he came to this country.

Witness was questioned as to the public notoriety, in relation to the manner in which the children of Russell Martin held their slaves. Objected to by W. R. Martin; objections overruled and exceptions taken. Witness said the claim of Russell Martin to all the slaves, was of public notoriety. He, McKinney, further stated, that James Lawrence brought a negro girl to this country, and heard him say frequently that the negro did not belong to him, but was loaned to him by his father in law, Russell Martin. Lawrence spoke of this before Russell Martin came to Missouri.

Elijah Adams said, I lived in the neighborhood of old man Martin, Sam'l. and W. R. Martin from the spring of 1832 to the spring of 1841. It seemed to be the general understanding in the neighborhood, that the negroes in the possession of the children, were a loan from the old man. W. R. Martin objected to witness detailing the general understanding in the neighborhood. Objections overruled and exceptions taken.

Upon cross examination witness said, I am of the impression that I heard a majority of the neighbors speak of the rumor as above stated. I am under the impression that the whole neighborhood knew it. I have talked with a half dozen of the neighbors on the subject.

Isaac Tate, another witness said, I was acquainted with the old man Martin and his family. The old gentleman was living at the place where he died when I moved to the neighborhood.

W. R. Martin has moved there since. He has been there four or five years. Previous to that time he lived six or eight miles from his father's. Complainant asked witness if it was generally understood in the neighborhood, to whom the negroes in the possession of Russel Martin's children belonged. Objected to by W. R. Martin; objection overruled and exceptions taken. I have heard the rumor spoken of by my neighbors. It seemed to be understood that the negroes in possession of Russell Martin's children, were loaned. It has been familiar to me as long as I have known the family, that the understanding related to all the negroes furnished the children by the old man; as I understood a negro girl was furnished each one of them, to be given up at the old man's death.

Calvin Tate said, I lived in the immediate neighborhood of Russell Martin about twelve years; proves general understanding in the neighborhood, that the negroes were loaned to the children. Objected to by W. R. Martin; objection overruled and exceptions taken.

Upon cross examination, witness said, I have heard a number of neighbors speak of it. I can give the name of A. Allen. It may have been eight or ten years since, I heard him speak of it. I have no impression before. I heard a good many speak of it; had some conversation about it before John Martin became insolvent; thinks it was before embarrassment of John T. Martin.

Franklin Burt said, I have been in the neighborhood of Russell Martin about eleven or twelve years. It was a common report in the neighborhood that old man Martin had loaned his children negroes; objected to; (objection overruled and exceptions taken.) Upon cross examination witness said, I don't know but I have heard my neighbors speak of it. Before the death of the old man I heard Swan speak of it. I never heard it contradicted 'till a little while before the old man died. There was then some objections.

John Harrison proved general understanding in the neighborhood that negroes were loaned to the children of Russell Martin; objected to, overruled and exceptions taken.

George L. Smith said, from rumor before the old man's death, it was commonly understood in the neighborhood, that the negroes belonged to old man Martin. I have heard others say that they did not belong to the old man, but a majority that they did belong to him.

Here the complainant closed his case, and the defendant, W. R. Martin, introduced the following testimony:

R. B. Overton said, I have known the family of Russell Martin since 1811 or 1812. Came to Missouri in the fall of 1825. Samuel and W. R. Martin and myself married sisters. At one time Samuel Martin proposed to sell me a negro woman, say two or three years ago. He said it was one that his father had given him. We differed in regard to the price of the negro. There was nothing about a loan. He spoke of no other person having title to the negro. I was then in the negro trade and would have bought her if Samuel Martin had been willing to take what I considered was a fair price. I knew nothing about the old man lending his negroes. Most of the time from 1841, to 1845, I lived within three or four miles of Russell Martin and was intimate in his family and was frequently at his house. For a while in this county I lived in six or seven miles and part of the time ten or twelve miles; was at the old man Martin's frequently in Missouri, and he was frequently at mine. I never heard of any public rumor until about the time of J. T. Martin's failure, and never heard a rumor about the old man's loaning negroes to his children, 'till I came to Missouri. I have heard Russell Martin say, that he had taken Woodford, one of the children of Caroline, the woman of John T. Martin into possession, because he had paid money for John T. Martin, as an indemuity to him. He said he had paid debts both in this state and Kentucky for John T. Martin. The old man said to me he wished Samuel would sell the negro, she was nothing but trouble to his wife and pox take the negro (which was a common expression with him) she was no account nohow.

Upon cross examination by complainant, witness said it was after Sam'l. Martin had proposed to sell the negro to me, that the old man said he wished Samuel would sell her. When Samuel proposed selling the negro to me, he said nothing about the title. After the old man had spoken to me about Samuel's selling the negro, he reckoned if I bought the negro the old man

would make a bill of sale, as he had never made him one yet. The old man was not pres ent at either of the conversations with Samuel. The conversation took place a year or two before the old man died. It has been several years, since I had the conversation with the old man about the negro Woodford. Sam'l. Martin said his father had not made him a bill of sale, but he reckoned he would, and I came to the conclusion that Samuel would make one to me if we traded. The negro Woodford spoken of, is the son of Caroline, the girl that John T. Martin received of his father Russell Martin.

Edward Sallee said, I have known Russell Martin and his sons for near 16 years. I have lived about six miles from the old man's, and was tolerably intimate with the old man of late years. There was no general rumor in the neighborhood in relation to the old man's having loaned the negroes to the children, so far as I know, until 3 or 4 years back, about the time of John T. Martin's failure, there having been some talk about selling John's negroes.

Upon cross examination by complainant, witness stated, I have heard the rumor of late years in relation to the negroes being loaned to children, but not later than John T. Martin's embarrassment. I assessed the county twice; the last year was in 1837, the first in 1834. The old man gave in some negroes, but did not state, as I recollect, in whose possession or where they were.

Caleb Tinsley said, I have seen the negro Hanna frequently, when I first came to Missouri, at the old man Martin's house. The negro Hanna came up and told me how-dy. I enquired who she was, and the old man said she was Billy's Hanna. W. R. Martin married before he left Kentucky.

Martin A. Miller. I have known W. R. Martin since 1828; lived within one and half miles of him for ten years. He had negro Hanna in his possession all the time. I am acquainted with the family of Martin, and never heard the rumor that the negroes in the possession of the children were loaned to them by the old man 'till after the commencement of this suit. Hanna was 10 or 12 years old when I first knew her. I never knew of any one else except W. R. Martin exercising acts of ownership over Hanna. For the last 7 or 8 years, W. R. Martin has not lived nearer me than 8 or 9 miles ; neither did the old man at any time. I heard of the embarrassment of John T. Martin; it was a matter of public notoriety.

Henry T. Wright said, I have known Russell Martin and his sons since 1817. W. R. Martin was married in 1826, in the fall of that year, and the old man moved to Missouri the same fall. Previous to his removal, he placed negro girl Hanna in W. R. Martin's possession. She was then quite small. She was placed in his possession but a short time after his marriage. Part of the time since, I have been in this State, and have lived 4 or 5 miles from W. R. Martin's, and the balance of the time 12 or 13. I have heard rumors that the old man loaned negroes to his children, but can't say how or when. I heard of John T. Martin's being embarrassed, and it is since then I heard the rumors. I am satisfied I never heard of it before. I never even heard that the negroes in possession of W. R. Martin were loaned to him 'till since this suit has been commenced. I never heard one of the family speak of it. I was frequently at the old man's; was very intimate with him; I always heard the old man speak of the negroes as Billy's Hanna, Samuel's Sally ; I never heard him say he had loaned or given the negroes, but always spoke of them as the childrens' negroes. I knew negro Lewis of W. R. Martin in 1826. He was between 9 and 15 months old. I am the brother in law of W. R. Martin and Samuel Martin; they both married my sisters ; I am friendly with both.

Upon cross examination, he said, Russell Martin and W. R. Martin, at one time, lived 7 or 8 miles apart; since then about half a mile.

John Jones said, I have been intimately acquainted with Russell Martin and his family for 25 years; lived 7 miles from Russell Martin's, from his removal to this State 'till his death, and was intimate with his family all the time. I don't know that I ever heard a rumor that Russell Martin had loaned his slaves to his children. I once heard Lawrence say that the old man had never made a title to the negroes he had. I never heard old man Martin say he had loaned the negro to W. R. Martin or others of his children.

Here W. R. Martin introduced the inventory of slaves belonging to the estate of Russell Martin, deceased, as made out and sworn to by Samuel and W. R. Martin, and first identified it by the clerk of the Callaway county court. The names of the following negroes were found to be in said inventory : Randall, Samuel, Dudley, George, Madison, Charles, Woodford, Hannah, Stephen, Charlotte, Ann, Joseph and Andrew Jackson. Said inventory was dated the 19th of May, 1846. The foregoing are all the negroes in said inventory.

Henry T. Wright being again called, said, I cannot say positively when Lucy Dudley Lawrence died, but think she died before the negro girl. I was at the old man's after the death of Mrs. Lawrence, and saw the negro there. She had a bad cough. I asked the old man whose negro ; he said the old lady had brought her home to doctor her. There was a negro man belonging to the estate of Russell Martin, named Samuel; not the son of Hanna; in fact, Samuel is about as old as Hanna. The negro W. R. Martin has in his possession, Hanna, nor none of her children, are mentioned in the inventory just read.

F. Smith said, I have been acquainted with Russell Martin and his sons about 15 years. For 6 or 7 years I resided in about a mile of W. R. Martin's ; have been intimate with him all the time. I lived some 7 or 8 miles from W. R. Martin when the old man died, but was frequently at the old man Martin's. So far as I recollect, I never heard any general rumor, 'till about the time suit was brought, either in my neighborhood or in the neighborhood of the old man, and never heard Russell Martin make any claim to the negroes.

Ezra B. Sitton said, I have been acquainted with Russell Martin and his sons ever since they have been in the country, and was frequently at their houses. I never heard any thing about the rumor in relation to the negroes being loaned. I never heard it spoke of in any way. I lived about fifteen miles from Russell Martin. I knew the negroes of W. R. Martin, but don't recollect their names, except the boy Lewis and the girl Hanna. I never had a conversation with old man Martin about these negroes. I have heard him speak of John T. Martin's negroes in the time of John's embarrassment. I have been in the habit of mixing a great deal among the people of this county, and had claims in my hands for collection against John T. Martin.

Mrs. Lawrence, another witness, said, I have been acquainted with Russell Martin and his family ever since I can recollect. My mother and old lady Martin were sisters. I was married at Russell Martin's in Kentucky. The oldest daughter had a negro girl in her possession. I don't know how she received the negro. I know that W. R. Martin had a girl in his possession in Kentucky. I was intimate with the family, and lived at old man Martin's before I was married. The old man came to Missouri before I did. I have been here 12 or 15 years, in the neighborhood all the time, not exceeding 5 miles from the old man's, most of the time close to the old gentleman's. James Lawrence had possession of negro Anna; got possession of her in Kentucky, and brought her to Missouri. I was a great deal about Russell Martin's house, but never had a conversation with him about the slaves he had let his children have, nor never heard any.

Upon cross examination, said, I dont know that the negro Anna, after the death of Mrs Lawrence, went back to Russell Martin's. Whenever I went to James Lawrence's I saw her there. I did not live more than 3 miles from James Lawrence. Before my husband's death, I heard James Lawrence speak of the negroes being loaned—never heard any other rumor 'till since the old man's death. I always heard W. R. Martin say the negroes were a gift.

Here W. R. Martin closed his case, and the complainant offered the following rebutting testimony.

J. B. Grant, clerk of the county court, was shown a paper signed by Samuel Martin, to wit: "In addition to the inventory made by Saml. Martin, and W. R. Martin, adm'rs. of the estate of Russell Martin, dec'd., there is in the possession of John T. Martin 5 negroes ; in the possession of W. R. Martin, 5 negroes ; in Sam'l. Martin's possession, one negro, all claimed as the property of Russell Martin, dec'd., also claimed by John T. Martin, and W. R. Martin, as their individual property, and therefore refuse to give them up. I therefore wish the direction

of the Callaway county court, upon this matter.—N. B. There is also one negro in the possession of Richard Swan, Sr., for which John T. Martin, received the benefit.

SAM'L. MARTIN."

but not sworn to, and said I have no recollection of this paper being handed to the county court. Sam'l. Martin handed me the paper, and requested me to take care of it. I told him I would put it among the papers, which I did, but never marked it filed. I think this took place after the inventory was filed. Inventory of negroes in John T. Martin's possession, filed 7th of January, 1847.

Jas. McClanahan said, I was judge of the county court, in April, 1846, was shown the before recited paper, I have no recollection of Saml. Martin ever having presented this paper to the Court. I recollected of his speaking of slaves, and asking the county court if he could file an additional inventory, including W. R. Martin's slaves. I think we instructed him to file it. I think this took place after the filing of the inventory, and in August or September, 1846. He said his co-administrator refused to sign such a paper, and wished to know if he could do it. It was a verbal statement to the court.

Franklin Burt being again examined, said, I was one of the appraisers of the estate of Russell. Martin, deceased. We appraised 16 slaves; was shown the writing before recited, said he wrote it, and about the time it bears date. The negro in Saml. Martin's possession, was not appraised at the time the rest were, Saml. Martin demanded of W. R. Martin and John T. Martin, the negroes in their possession, to be appraised, but they refused to give them up. Also spoke of appraisements which were filed in December, 1846, and January, 1847, of negroes.

Upon cross examination, witness said, at the time the negroes were demanded, W. R. Martin said he had got the girl when he first went to house keeping, and when she was about 8 years old, and had raised her and her children, and considered them as his. Complainant offered to read the recited paper signed by Saml. Martin which was objected to, sustained and exceptions taken by complainant. Complainant offered to read the last mentioned appraisements signed by Samuel Martin; objected to, sustained and exceptions taken by complainant. Complainant offered to prove that Russell Martin had claimed the negroes in his life time, which claim was not in W. R. Martin's presence; objected to, sustained and exceptions taken by complainant.

The foregoing was all the testimony given by either or both of the parties. The defendant, W. R. Martin, then filed a motion to set aside the decree and grant him a new trial, which being overruled, he excepted and appealed.

HAYDEN and SHEELY for appellants.

1. The court had no jurisdiction of this cause. It was properly within the jurisdiction of the county or probate court; that court having full and complete jurisdiction over probate business. See Digest 1845, art. 1, title Administration, sect. 12, 15, 16, 33, 44 and 45; art. 5, secs. 8 and 9; art. 2, secs. 1, 2, 3, 4, 9, 11, 12, 43 and 45; county courts, power and jurisdiction of, Digest 331, sect. 13.

2. In this cause illegal and improper testimony was received. Public rumor had nothing to do with the case. It was illegal and improper, and should not have been received. The rules of evidence being the same in equity as at law, and so as to the competency or incompetency of witnesses, and of other proofs in causes in the respective courts. 2nd. Story's Com. sec. 1527; 1 Atkins 453; Glynn vs. Bank of England, 2 Ver. 41.

3. Where a parent at the time a child commences housekeeping, sends with said child a negro, without declaring at the time that he loaned said negro to such child, the presumption of law is, that said negro was a gift to the child. Smith vs. Montgomery's adm'r.; 5 Monroe 502; 4 Bibb. 35; 3 Suttell 136; Bell vs. Strother; 3 McCord 207; Degraffield vs. Mitchel[l]

Ib. 506; Eddings vs. Whaley; 1 Rich. C. R. 310, 316; Bird vs. Ward; 4 McCord 229, 231, Brashear vs. Blassingham; 1 Nott and McCord 224; Moore adm'r. vs. Dawney &c.; 3 Hen. ning and Munford, 133; Olds vs. Powell; 7 Ala. Rep. 655, (new series,) Carter's Ex'r. vs. Rutland, Haywood, 113; Parker and wife vs. Thomas, Ib. 451; Mulliken vs. Greer, 5 Mo. Rep. 489.

4. As the plaintiff has called upon the defendant to answer the bill of complaint, charging that the negroes were loaned, and not given to the defendant (the appellant) by his father, the denial of the allegations, so made by the complainant, is to be taken as true, unless by two witnesses, or by one witness, and strong corroborating circumstances, the same is proved to be false. 7 Cranch, 69; 3 Wheaton 520; 6 Wheaton 453; 5 Peters 99; 1 Washington's Cir. Chy. Rep. 230; Baldwin's cir. Chy. Rep. 494; Greene vs. Vardeman, 2 Black, R. 328.

5. In this case the answer of the co-defendants, admitting that their negroes received rrom their father, were received as loans, are no evidence that the negro of W. R. Martin, was not given to him by his father, unless a father cannot give to one child and loan to another; and even if a presumption could arise, that he would not so act, the fact of such lending to the co-defendants, cannot be proved by their answer or admissions in this case, as they are heirs, and interested as such in the estate sought to be enlarged by a decree for the complainant below, appellee here. 3 Conn. Rep. 319; Turner vs. Holeman; 5 Monroe 411; Thomas vs. Tucker; 2 Black 172; Morely vs. Armstrong; 3 Monroe 389; Adams vs. Hays; 2 Iredell 361 and 4; Old vs. Powell; 7 Ala. Rep. 656; Jones vs. Hardesty and others; 10 Gill and Johnson, 416.

6. The old man's statements and claim of the property, made in the absence of W. R. Martin, whilst the same was in possession of W. R. Martin from the time of his marriage, are no evidence of title or right in the old man to the negroes, nor was the assessment and payment of the taxes thereon, for the reason that no man is allowed to manufacture evidence for himself against another's rights. Green vs. Harris; 3 Iredell 210; Gilbert and wife vs. Lamberton; 1 English's Rep. 121.

7. In this case there is no evidence conducing to show that the negroes were loaned, except some loose admissions of W. R. Martin, made a number of years since, and to say the most of them, are in all cases most unsatisfactory evidence on account of the facility with which they may be fabricated and the impossibility of contradicting them. Besides the slightest mistake or failure of recollection, may totally alter the effect of the declaration, and in this case there are no legal corroborating circumstances. Bottsford vs. Bur; 2 J. C. R. 411; Stone vs. Ramsay; 4 Monroe 239; Adams vs. Hays; 2 Iredell 369; Linch vs. Linch; 10 ves. C. R. 518; Thomas &c. vs. Thomas; 2 J. J. Marshall 65; 1 Greenleaf, sec. 200, page 241; Moore vs. Smith; 14 Serg. and Ran. 393; Mullikin vs. Greer; 5 Mo. R. 489. If the court, however, shall consider such loose admissions as evidence, then they are bound to consider all the dec- larations of said William, though made at different times.

LEONARD & ANSELL for appellees.

*First.* In reference to the jurisdiction of equity in this case.

The object of the bill is to establish the title of the estate of Russell Martin, deceased, to five slaves claimed and held adversely to the estate of William R. Martin, one of the two administrators, under an alleged gift from his father, the intestate, and to compel the adminis- trator to administer them as part of the estate, and the jurisdiction of the court may be sup- ported upon either of the two following proofs or items:

1. Whenever there is a right, recognized by the law of the land, and the legal remedy is accidentally extinguished, equity will take jurisdiction and enforce and protect the right ac- cording to the exigency of the case. Here the right of the estate to the slaves in question, cannot be set up at law. A man acting in a representative capacity, cannot sue himself act-

ing in his own right, nor can one joint administrator sue his companion at law. Milford's Plead. 160, 167; 1 Story's Equity, secs. 78, 81, 100, 679, 680; Saunders heirs vs. Saunders Executors, 2 Littell Rep. 315, (cited in 1 Amer. Chan. Dig. 437, sec. 14) 2 Williams on Executors, 689, 690.

2. The property of an intestate's estate, is subject to the trusts declared upon it by law, which are the judgment of the debts and distribution among the heirs, and the administrator is the trustee appointed by law to execute these trusts, and this, like all other trusts upon property, is subject to the jurisdiction of equity, whatever doubts may exist in relation to the source of the jurisdiction of English equity over executors and administrators, all these doubts are extinguished here by both constitutional and legislative enactments, expressly conferring it upon our courts of equity. Adair vs. Shaw, 1 Sch. & Lef. 262; 1 Story's Equity, secs. 532, 533, 534; State Cons't. Art 5, sec. 10, Rev. Stat. of '45, p. 330, sec. 6, clause 6; 2 Story's Equity, sec. 1328, 1329, 1330, 1333, 1335.

3. The jurisdiction of a court of equity, founded originally on the want of an adequate remedy at law, is not divested either of the subsequent assumption of jurisdiction by the law courts, or by their subsequent acquisition of it through express legislative enactments, unless the jurisdiction of equity is taken away, either by express words or the vesting of an exclusive jurisdiction over the matter in a different tribunal. 1 Story's Equity, sec. 63; Kemp. vs. Prior 7 Ver. 248; Mathews vs. Newby, and Howard vs. Howard, 1 Verne, 133 & 134; Varet vs. New-York Ins. Co. 7 Parges Rep. 567.

4. There is no pretence that the jurisdiction has been expressly taken away, and the jurisdiction conferred on the county courts over the estates of deceased persons, is not exclusive of the equity jurisdiction of the circuit court, over executors and administrators. Rev. Stat. 1845, Title "courts," secs. 6, 13, 14, 15; Rev. Stat. 1835, Title "courts." secs. 8, 15; Rev. Stat. 1825, Title "courts," secs. 4, 6; 1 Territorial Laws, 683,684, secs. 3, 10; Irwin vs. Henry, 5 Mo. Rep. 470; Berry vs. Robinson, 9 Mo. Rep. 278; Clark & Wife vs. Henry's Adm'r. 9 Mo. Rep. 342.

5. If, however, it be admitted, that much of this equity jurisdiction has been conferred by our statute, exclusively upon our county courts, there is no ground for asserting that questions of title to property, set up by the estate against strangers, and much less when set up against one of two joint administrators, is a matter subjected to the exclusive jurisdiction of our county courts.

Second. In reference to the facts of the case.

1. The Proof clearly establishes, that the transaction under which the defendant, William R. Martin acquired the slaves in controversy, was a loan, and not a gift. The plan adopted by the father for the distribution of his slaves among his children, was to retain the title in himself and permit them to have the possession during his life, to be returned with their increase at his death into the common mass of his property, and the whole to be divided equally among all his children.

2. The bill charges the transactions with the children, to have been loans, and not gifts. The answer denies that they were loans and insists that they were all gifts, and declares that the father never did claim the slaves in the defendant's possession. On the hearing, the plaintiff proved that the father did claim these slaves, and then, to prove the defendant's knowledge of this claim, gave evidence (which was objected to) that the claim was a matter of notoriety in the neighborhood of the parties. The object of the proof was to falsify the answer, and to establish the defendant's knowledge of the father's claim; and proof of its notoriety in the neighborhood was competent evidence for that purpose. Round vs. Gordon, 8 Mo. R. 19; 2 Story's Eq. sec. 1528; 1 Starkie, 520 side paging; 11 Serg. and Ran. 373; 14 Johns. R. 215; 4 Wend. 96; 4 Bibb. 35; Keese and West vs. Macey; Benoist vs. Darby; 1st. part, 12 Mo. Rep. 196.

But if this proof be struck out of the case, the other evidence in the record is amply suffi-

cient to establish the loan, the only contested fact in the record; and of course, for such an error, the decree cannot be reversed.

3. The proof offered by the defendant, that John Martin claimed the slaves that were put into his possession, as a gift, and not as a loan, is not legal evidence that such was the fact, and if admissible and now received with the proof, would not change the result as to the material facts of the case, and of course is no ground for reversing the decree. Turner vs. Belden, 9 Mo. Rep. 797; 4 Ala. Rep. Oden vs. Stubblefield, page 40, sec. 1; Supplement to State Digest page 706, sec. 1132.

*Third,* in reference to the pleadings.

1. The bill is not multifarious, Whaley vs. Dawson, 2 Sch. Lefr., 370, 371; Campbell vs. Makay, 1 Mylne & Craig, 306 (13 Cond. Eng. Can. Rep. 544) Fellows vs. Fellows, 4 Conn. 683; Brinkerhoff vs. Brown, 6 John. Chy. Rep. 139; Story's Equi. Plead. secs. 271, 278, 279, 283, 284, 285, 286, 530, 531, 532, 533, 534, 538, 539.

2. If it be, no advantage can now be taken of this defect by this defendant. The other defendant John Martin, appeared to the bill and put in his answer, stating that he had surrendered to the administrators the slaves in his possession, and renouncing all right to them except as heir of the estate, and does not himself object to the bill, or appeal from the decree that has been made. Story's Equi. Plead. sec. 283.

Opinion by NAPTON, J.

The question, as to the multifariousness of this bill, would seem to be quite an abstract one in the present position of the case. The question was originally raised by a demurrer to the bill, filed by the present appellant, W. R. Mattin, and his co-defendant, John T. Martin. The demurrer of the latter party was sustained, but he subsequently filed an answer, disclaiming all title to the slaves in his possession, and giving them up to be administered as a portion of the estate of Russell Martin. The demurrer of the appellant was overruled. The other defendants, who were distributees or heirs of Russell Martin, in conjunction with the appellant and appellee, filed their answers, admitting the allegations of the bill, so far as the slaves in their possession was concerned. At the hearing, the whole case was narrowed down to a controversy between the appellant and the appellee. That controversy was investigated on its merits; a mass of testimony was introduced, and it is difficult to see any advantage which could result to the appellant from a reversal of the decree upon the ground of multifariousness, provided the other questions involved in the case should be determined against him. These suggestions are, however, made, rather as an apology for not going into a very critical examination of the authorities which have been referred to upon this subject, and not with a view to leave the point undecided. I believe the objection to be untenable. Passing by the question of jurisdiction, which will be presently considered, it will be seen that this bill has a common purpose in view, based upon a single and connected proposition. All the defendants stand in precisely the

7

same predicament.  They are all heirs of Russell Martin, and as such only claim a title to the slaves in their respective possession, by gift from the common ancestor and independent of their rights as distributees.  If the title of one is good, the title of all is good ; if one fails, all must fail.  This is the assertion of the bill.  The charge of the bill, is that Russell Martin, the ancestor, put into the possession of each of his children a slave, as a loan, and with the express understanding that the slaves were to be returned at his death, and they and their issue divided equally among his children.  The whole object of the bill is to have this title, asserted to be in the heirs of R. Martin, ascertained and protected.  The bill is against several persons, but the demands against each are similar, based upon the same facts, and growing out of and depending upon the same principles.  It is true, that one of the defendants, W. R. Martin, occupies the position of co-administrator as well as a claimant in his own right ; but it is in the latter character only that he claims any title to the slaves in his possession.  Whatever effect the appellant's position, as administrator, may have in giving jurisdiction to the court, it is certainly only his antagonistic position to the estate that he is called upon to defend.  Such is also the position of the other defendants.  Why compel the personal representative to bring as many suits as there are heirs, when the whole matter can be as well and better settled in one suit ?  If the claims of the several defendants were derived from different sources, or depended upon different principles, and had no necessary connection with each other, so that the bill might fail as to one and be sustained as to another, I can see the inconvenience and impropriety of commingling such disconnected demands.  But this is not so, and I therefore conclude that the question of multifariousness should not prevail.

I have no doubt of the jurisdiction of a court of equity in cases like the present.  Where property alleged to belong to a decedent's estate, is in the possession of a third person, setting up an adverse claim, can there be any doubt that the personal representative of the decedent could maintain trover, or replevin, or detinue ?  Those sections of the administration act, which have been thought to provide a remedy in the county court in such cases, would not, upon any construction, oust the circuit court of its common law jurisdiction.  The 9th section of the 2d article of the act provides for a case, where any person "conceals or embezzles" goods of the deceased.  These terms would seem to imply fraud, but if the administrator preferred to waive the fraud and bring his action of trover, could a demurrer to the declaration be sus-

tained on the ground of an exclusive jurisdiction in the county court? The cases which must have been contemplated by the 9th and preceding sections, are probably such where the title of the estate is beyond dispute. Very summary proceedings are authorized ; a citation and examination on oath are permitted. Where a serious ditpute was anticipated about title, a prudent administrator would scarcely venture on this extraordinary remedy. The action at law is plain, and his authority to bring it is beyond dispute. The 21st section of the same article expressly requires the administrator to commence and prosecute all actions which may be necessary in the course of his administration.

But the defendant, W. R. Martin, was a co-administrator with the complainant, and a suit at law could not have been maintained. The administrator could not sue himself, nor could one administrator sue his companion at law. If it be said, that the act concerning administration, has provided a mode of removing an administrator in cases of this character, and that by pursuing this mode, the defendant might have been sued at law, the necessity of such circuitous proceedings only more clearly brings the case within the jurisdiction of the chancellor. The remedy preseribed in the administration law, if any be admitted to exist, is not of that clear, ample and complete character, which ought to divest a jurisdiction already existing in another tribunal; plain, adequate and satisfactory. To proceed against the administrator for unfitness must also, to some extent, involve a consideration of the very same questions of title, which have ultimately to be decided in the subsequent proceedings. The law does not encourage circuity of action. When a controversy can be settled in one suit, it is not good policy to require two.

Upon the facts of this case, I shall not dwell. To show where the weight of testimony is, would be to recapitulate all the evidence, which is voluminous, and may be found in the statement. I shall advert to one or two circumstances only, as satisfactory to my mind in favor of the decree.

It cannot be denied, that the testimony which ought to establish such an arrangement as is charged and sought to be enforced in this bill, should be of the most unequivocal and satisfactory character. Such plans are usually resorted to, with a view to protect property from creditors. They are seldom made in good faith, and where there is no want of good faith, they are still unequal and unjust in their operations, and tend to produce dissatisfaction and dissension. Courts of equity cannot view such dispositions of property in a favorable light ; every presumption of law and of fact is against their existence ; yet where they

are clearly proved, the right of the parties to dispose of their property according to their own caprices, is indisputable, and the contract proved must be enforced, however absurd or unjust.

Entertaining these views, in relation to the policy and propriety of such dispositions of property as is claimed to have been made by Russell Martin among his children.   I have scrutinized the testimony with no unfavorable propositions against the defendant's rights.   But there is a mass of testimony from witnesses who stand unimpeached, and whose opportunity of knowing the facts must have been great, all tending to establish the fact that Russell Martin placed with each of his children, upon their marriage, a female slave, *as a loan*, and with a distinct understanding on the part of the children, that the slave and her increase should be returned at his death into the mass of his estate, to be again distributed under the law.   It is a fact, worthy of some consideration, that all the children in this case, except the defendant, admit this disposition, and have returned their respectives shares of slaves.   In relation to some of these heirs, it was their interest to maintain such an understanding, and their testimony to its existence, may therefore be entitled to but little influence.   But this was not the case in relation to one or two of the others, who, in addition to the present defendant, were losers by the establishment of the title of Russell Martin's representatives, and their admissions tend to corroborate very strongly the assertions of the interested parties.

The admissions of the defendant, W. R. Martin, made during a long series of years, repeated to various witnesses upon various occasions, are certainly very convincing proof to establish the truth of the allegations of the bill.   These admissions, however, are not alone, and unsupported by acts, but they were corroborated by acts of ownership asserted by the father, under circumstances calculated to leave but little doubt as to the real understanding of all the parties to the transaction. Russell Martin, the father, continued to pay the taxes of the slaves put in the possession of his children, and upon the slaves now claimed by the defendant, for a long series of years.   W. R. Martin, the defendant, was heard upon several occasions to speak of the transaction as a loan, and to laud the justice and propriety of the arrangement, by which, as he then supposed, the sons and sons in law of his father would be prevented from dissipating the property advanced to them.   In the course of ten or fifteen years, after the defendant had received the female slave, now claimed by him, from his father, he began to perceive the injustice and impolicy of his father's project.   He then set about

asserting title, but his course on these occasions, is one of the most convincing proofs to establish the title of his father. He never asserted that the slave in his possession had been given to him, but he commenced building up a title on long and peaceable possession. Having conceived a notion that five years peaceable possession gave title, he based his rights upon that doctrine. He never pretended that his father had given him the slave, but that his long and uninterrupted possession of her would, in the eye of the law, and as he had been advised, constitute a title for him. Is not this assertion, coupled with his former assertions, acquiescing in the original term of a loan and the repeated practical assertions of title on the part of the father, by paying taxes on the slave, sufficient to make a strong case against the defendant?

The testimony in relation to the public rumor, I have not noticed, because I think it was inadmissible, and there is ample testimony without it ; nor is there any counter evidence of any note. Nearly all the testimony on the defendant's behalf is of a negative character. Numerous witnesses are introduced to prove that they had not heard any public rumor. That Russell Martin's slave had been loaned to his children, such negative testimony is entitled to but little weight, when opposed to positive testimony to the contrary, of unimpeached and disinterested witnesses.

The declarations of Russell Martin, the father, in the presence of the defendant, and uncontradicted by him, were also in evidence, and entitled to weight in aiming at the facts.

I consider, then, the repeated admissions of the defendant, and his subsequent assertion of title upon a supposed acquisition of one by long possession ; the payment of taxes by the father, and his unequivocal declarations that the slaves were his, made in the presence of the defendant, and acquiesced in, although with evident dissatisfaction by the son ; the acknowledgment of all the other children and sons in law of the father, Russell Martin, that the slaves held by them were loans, as altogether forming a mass of testimony in favor of the allegations of the bill, which I am not at liberty to disregard. Mere presumptions, however strong, cannot outweigh a mass of unimpeached positive testimony.

## PETITION FOR A RE-HEARING.

*To the Honorable the Supreme Court of the State of Missouri :*

Your petitioner, W. R. Martin, by his solicitor in the above entitled cause, most respectfully solicits the court to grant unto him a re-hearing

in said cause ; and in presenting this petition, his solicitor begs leave to premise, that he feels it his duty to your petitioner to do so. After having carefully perused the decision of the court, as well as the evidence in the cause, upon which the same is founded, he would state, that he feels no disposition whatever to question the correctness of the decision of this court, so far as the jurisdiction of the chancellor, as exercised by the circuit court in taking cognizance, &c., of the cause is concerned ; but that he feels conscious if the court in reconsidering the cause, will discard and disregard all that mass of illegal and irrelevant testimony which has found its way into the cause by an oversight of the court below, upon the trial there, it is impossible, your petitioner humbly conceives, to find remaining in the record evidence applicable to the case in equity to sustain the decision.

The undersigned, as solicitor aforesaid, would respectfully insist, that the court, in deciding the cause, by all the rules of evidence, (as well at law as in equity) are bound to disregard : 1st. All that testimony given in the cause with reference to the public rumor, respecting loans of negroes to his children, by the deceased in his life time, at the time of their marriage respectively ; and I understand this evidence is disregarded as irrelevant and illegal by the court in the decision rendered.

2nd. That the court is bound to discard the evidence with respect to all that the intestate said, as well as any act he did, whether in the assessment of the negroes in controversy for taxation, or in the payment of the taxes on the property under such assessments, under any claim or pretended claim of right thereto, whilst the same was in the possession of the said William R. Martin, as shown by the proof. Your petitioner respectfully states, that the law knows no distinction as existing in favor of the right of a father over a stanger, who is out of possession of property, which is in the possession of the son, claiming and exercising acts of ownership over it as his own, to assert that he is the owner of it in the absence of the son, or by paying taxes on it, so as thereby to create in himself a right, or evidence of right, to the property. No such distinction is or can exist in law, and surely no one will contend that A, can establish his right to property in the possession of B., who is exercising acts of ownership over it as his own, by representing to others, in the absence of B., that the property is his, and not the property of B., or by assessing and paying the taxes on the property thus in possession of B. If such were the law of this land, men of enterprize, with little labor and little money, in

a short time could amass very handsome estates. If such evidence cannot be concocted by a stranger, nor by a father, so as to establish right to property in possession of a son, then, all such as is found in the record, the court is bound to close its eyes upon. It is not there in contemplation of law, and cannot be seen and will not be seen by this court. Then this drossy mass, being out of the case, I beg leave of your Honors to permit me to apply the pruning knife to all and every thing that is stated in the answers of the co-defendants in the cause, as well as every thing they may have stated in part, as well as the state· ments of others in derogation of the rights of my client, for the follow-ing reasons. As to the co-defendants, they are all interested, being heirs of the deceased, and would not be competent witnesses if sworn, and their answers as co--defendants cannot be read against the appellant. The statements of other persons, not on oath, are inadmissible. The record being thus cleansed, permit me to call the attention of the court to that which has a legal place in the record, as evidence, as well against as for my client. And, first, as to the evidence against him and in favor of the complainant. It consists alone in the evidence of the supposed statements of my client, who is but one witness in law, made *not* upon oath, years ago, in alleged casual conversations, in the presence of some old woman and two or three other persons, respecting his right to the negroes in controversy. I here beg the indulgence of the court, to permit me to call the attention of the court to the testimony of these few witnesses, by referring to the same at the pages in the record where the same can be readily seen by the court, and by giving an extract therefrom in this petition. See the testimony of Mrs. Craig. She tes-tifies that some 15 or 16 years ago, she had a conversation with appel-lant, at the house of witness, in the presence of Moore and her husband, and appellant asked her if Mr. Craig, (her husband) paid taxes on the negroes which were given her at her marriage by her father: She replied in the affirmative, and to which respondent replied, that he thought the way his father did was the best, that his father loaned a negro to a child (not saying to him) and paid taxes on it, and if the negro died it was the father's loss.

Upon the cross examination of the witness, she could not recollect the year, but it was the year Moore assessed the county.

Mrs. Snell testified that her husband has been dead twelve years, and that in his life time, long before his death, she heard appellant tell her husband that his father did not give his children negroes, that he loaned them, and that at his death they would come back to the estate. She

states, that she does not know how the conversation came up, but it was in a conversation respecting the taking back of the negro which the intestate had given or loaned to Mrs. McGill, then deceased. Witness, upon cross examination states, that it has been so long since the conversation, that she can't remember much about it. It will be evident to the court, in reading the deposition, that appellant was making a plausible excuse for his father, under the circumstances, for taking from the husband, Mr. McGill, the negro, after the death of his wife, who left an infant whom the father was about to remove with the negro to Kentucky.

Samuel Martin jr., states that he and his father, John T. Martin, an insolvent, were going along in the road in a wagon, and that the appellant got into it and rode a little distance, and said it was a good idea, the way his father had let the children have the negroes, for if he had given them, the children might have spent them. He states that he can't recollect the particulars, but he said it was a mighty good plan, for some of the sons or sons-in-law, who might have spent them. That no one but him and his father were present at this conversation.

See Hawkin's testimony. By reading this testimony, the court will see, that a difficulty had arisen some twelve or fifteen years since, and a noise was made respecting the conduct of the old man Martin having taken away the negro he had given McGill's wife, who had died with her first child, and hence the noise and rumor about his having loaned instead of giving his negroes to his children; and hence the casual conversations, indistinctly recollected, spoken of and referred to by Mrs. Craig and Snell, in which the appellant was solving over the conduct of his father, so well calculated to make a noise in the neighborhood.

Tincher's evidence. He states that he had a conversation with Wm. R. Martin at his house, relative to John T. Martin's negroes. That he witness, had an execution against John T's. property, which gave rise to the conversation. That in this conversation about John T's. negroes, he said Capt. Jamison had said five years possession would give John T. title to his negroes.

Matthew Scott states, that he was at the house of Russell Martin, father of W. R., not a great while before his death, less than two years before that time, and that he heard a conversation between them of an angry nature, about the negroes of William; so much so that the witness tried not to hear it; that Wm. R. was not satisfied with the right to the negroes; that both Wm. and the old man seemed to be in a pet about it, and the old man told Wm. R. that "if you don't want to take care of and raise the negroes, send them home." That Wm. R. said he was

not willing to feed and raise the negroes forth e rest, and the old man replied as above.

This conversation was about seventeen years after the negro girl came to the possession of William.

Richard Swan testifies, that he bought a negro girl of John T. Martin, in the winter or spring of 1844. That the old man and John T. both signed the bill of sale for her. He states that he had several conversations with William on the subject of the title of John T. Martin to his negroes (not about William's negroes.) The last conversation was had about the time the witness was trading with John T. for the said negro. Witness told Wm. R. in this conversation, that he, witness, was afraid of the right of John T. to the negro, that John had told witness, when they were on a trade for the negro, that his, John's right, was good, and that Wm. R. (appellant) also told witness so. Witness, in this conversation, told Wm. R. that he, witness, (not William) had talked with certain counsel on the subject, and told him that John T. held (not William) by peaceable possession. He said that five years gave right, but that the old man's paying taxes on the negroes, done away with or interrupted that possession, and that he, (viz. the said counsel and not William) advised him, the witness, to have the old man's name to the bill of sale for the negro he was trading with John T. for. To what the witness Swan, thus told William, the appellant, as to this opinion and advice of this counsel, he William thus replied: "That if that was the case, he, William, would give in his negroes (that is assess them) from that time himself, even if the old man did assess them." And he further states, that he don't know that Wm. R. said, that he, Wm. R., held his negroes by peaceable possession. Witness further stated, that, William stated, that he did not think the witness would be in any danger if he took the negro without the consent of the old man, (which witness had then stated to William that he would) but that as the witness was giving a fair price for the negro, he would get the old man's name. Witness further states, that Wm. R. always told him, that he considered the right of John T. to the negro girl good, and recommended the levying of an execution upon her, and it was then that the witness told Wm. R. of the opinion, &c. of said counsel. Witness further states that the old man did join John in the bill of sale for the negro, and that he paid the price to John, except what was owing from John to him, as a debt, which was deducted, and that all the price so paid to John, was applied in payment of John's debts.

Complainant next offered and read the books of the assessors of Cal-

laway, which show the number but not the names of the negroes assessed by the old man or William.

Elizabeth Swan, daughter of the witness, Richard Swan, in stating her recollection of what passed between the old man and Wm. R., says, that she was at the house of the old man about five years ago, and Wm. R. was there, and the assessor came there, and she heard a conversation between the old man and William. The old man gave in his negroes and William R. objected to it and complained, but the old man said, "Billy, they are my negroes, and I will do as I please with them." Witness also heard a conversation between her father and William, in relation to the negroes, about four years ago, and that William was angry and complained of his father giving in his negroes, and stated that he had also given them in. Her father asked Wm. R. what he had to show for them, (the negroes) he replied, nothing but peaceable possession for a long number of years, and that he would hold them in spite of the old man. Witness, on cross examination, stated, that Wm. R. was very angry in both conversations. She says that she did not hear Wm. R. say any thing about a gift, but contended they were his negroes.

Here the court will remark, that William, in this as well as the other conversations between him and his father, claimed the negroes, objected to their being assessed by the father, was angry, in a pet, and also assessed them himself, and paid taxes on them, yielding no assent to or acquiescence in the claim of the father, but on the contrary, in his father's own house became so angry as to make unpleasant and disagreeable their conversations to one or more present at the time. It is true, that when Swan asked him what he had to show, as his title to the negroes, he responded thereto, "nothing but a long and peaceable possession," and which possession was acquired in such a way as all our courts in sister states as well as this, I believe, have decided to be legal evidence of a gift. He could have responded nothing else, as a citizen, unlearned in the law as he is.

The testimony above given, if the court please, is all the evidence having the slightest bearing, to disprove the right of William to the negroes, if it be true that the old man could not manufacture, by his own acts and sayings, in the absence of William, evidence for himself. And I defy any more to be found in the record, in favor of complainant.

I will now, by the indulgence of the court, proceed to contrast the evidence of the defendant with that of the plaintiff in the manner above pursued.

1st. There is the answer of the defendant, sworn to by him. He

states that he was married about the 1st of October, 1826, in Kentucky, where his father then lived. That he went to and lived apart from his father a few days after his marriage, when he received from his father, Hannah, who was then only about 7 or 8 years old. That his father gave her to him. That he received her as a gift, and not as a loan. That she has had 4 children. That he has raised and had the possession and services, &c., as his own, down to the present time. And that his father repeatedly told him that he intended Hannah as a gift; and that he did not intend that she or any of her children should be taken from him. He also states expressly, that at the time his father delivered Hannah to him, he gave her to him and so expressed himself at the time. This is the substance of the answer.

Then what are the facts and circumstances to corroborate the answer. They are the following.

1st. There is no evidence showing that at the time the old man delivered the negro to William, there was any thing said by him or done by him, so qualifying the transaction, as to rebut the presumption of law in favor of its being a gift, arising from the relation of the parties, the time of the delivery and the other circumstances of the case. See the following authorities. 5 Monroe Rep. 502, 503; 4 Bibb. 35; 3 Littell 136; 3rd. McCord 207; Bell vs. Strawther, ib 506; Degraffield vs. Mitchell; 1 Richardson's South Carolina Rep. Edding vs. Whaley.

2nd. The negro was only 7 or 8 years old at the time of the delivery and the old man left her in possession of the son, in Kentucky and came to Missouri, without any evidence of any intent on the part of William to come here, and no arrangement or guard whatever, by any step, writing or otherwise, common with men of the most ordinary prudence, to protect or secure the negro to himself, against the improvidence of a son, just named, and about to enter upon the business of life for himself, fearing no claim of the creditors of the son, &c. And not this alone, he permits the son to continue this possession peaceably, claiming her and her children as his own, for at least 18 or 20 years, before any denial of the right of the son, and then he sets up a claim, by paying taxes on her against the son's consent, who, in the father's house claims the negroes, quarrels with him, even there, expressly objecting to the acts of the father in assessing or paying taxes, and not one word or threat from the father, that he would compel the son, by suit, or otherwise, to surrender the property. And this adverse claim of the same, expressly made to the father, some 3 or 4 years before his death. I will here remark, though I hold the matter out of the case, that the payment of taxes by

a father for a son, is nothing but natural, and in law or in reason would only create a presumption of a gift to that amount.

3rd. Overton proves that he heard the old man Martin say he had taken a negro, Woodford, one of the children of the woman he had given to John T. Martin, as an indemnity to him for money he had paid for John, both in Kentucky and in Missouri.

If the negro had belonged to the old man and not to John, he would not have taken him on that account. This witness further testifies that he heard the old man express a wish that his son Samuel would sell a negro which he had received from the old man, saying that she was nothing but a pest to the wife of Samuel, and this was after the witness had been talking about buying the negro of Samuel, and of which the old man was apprised. He also proves the continued possession of the negro and her children, by William, and his claim of ownership of them from the beginning. He states that Saml. Martin, speaking of the negro he was about to sell witness, spoke of her as one his father had given him, and said nothing about her being loaned to him. Witness proves also, that Saml. Martin, Wm. R. and himself married sisters. That they were all intimate, and he never heard a rumor about the old man loaning negroes until about the time of the embarrassment of John T.

Caleb Tinsley, states, that he, on one occasion, was at the house of old Martin in Missouri, and saw the negro Hannah there. She came up to him and spoke to him in the presence of the old man. He asked him who she was, and the old man replied, that she was "Billy's Hannah."

This is positive evidence that the negro was the negro of William, for if he had owned her, the answer, would have been, "she is my girl, or negro Hannah."

Henry T. Wright, states, that he has known the old man and his sons since the year 1817. That Wm. R. was married in 1826. That the old man moved to Missouri the same fall. That previous to his removal, he placed Hannah, who was a small girl, in the possession of Wm. R. He proves the continued possession of her and of the children which she had, some 4 or 5 in number. That Hannah was placed in Wm. R's. possession a short time after his marriage. That Wm. R. did not move to Missouri 'till the next fall after the father moved. That he heard a rumor for the first time, of the old man loaning negroes to his children, at the time of the embarrassment of John T. That he never heard a rumor that William's Hannah was loaned to him until since the commencement of this suit. Never even heard one of the family speak of it, though intimate.

He states that he always heard the old man speak of the negro as Billy's Hannah." He never heard the old man speak of having given or loaned the negroes, but always of them as the childrens negroes.

Here again is positive evidence of the old man that the negro was William's.

There is an inventory of the estate of the dec'd., dated on the 19th of May, 1846, made out and sworn to by the complainant and defendants as adm'rs, of the estate of the old man, in which it appears that no one of the negroes mentioned is of those in controversy. Here is evidence of a strongly negative character, furnished under the oath of the plaintiff himself, who then knew, as well as now, the negroes of his father's estate, and he swears in that document, as does also the defendant, William R., that the negroes there inventoried, are all the negroes of the intestate. The law required him to make a full and complete inventory of the estate of the deceased, under his oath. Why did he not embrace within the inventory these negroes which he now sues for? He has shown no reason, nor can he show any.

The above is, in substance, the evidence given on the part of the defendant, leaving out all the evidence of a character as rebutting evidence, to that which I consider inadmissible and irrelevant as given by the complainant.

The undersigned has collected, in the above sketch, what he believes to be all the legal evidence given in the above cause, on either and both sides of the cause, and humbly conceives that when applied to the issue in the cause, upon those principles which govern courts of equity in their practice, clearly and manifestly show that the appellant is entitled to a decree against the appellee.

Your petitioner insists, that unless the plaintiff can invoke to his aid what he said and may have represented respecting his having loaned the negro, or what he did in the assessment and payment of the taxes upon the negroes, as mentioned in the record, there is not one particle of evidence in his favor, except the evidence gotten from the mouth of my client, the only witness, made, if at all, in casual conversations, when not on oath, and a long time since, in the presence of two old women and some two or three other persons, in no one of which conversations did he state that the negro, Hanna, was loaned to him and not given him, as stated in his answer, but in some two or three conversations, viz: in the presence of Mrs. Craig, Mrs. Snell and Samuel Martin, jr. They make him in substance eulogize or commend the way or plan of his father in loaning his negroes to his children, saying nothing about his own ne-

gro. These statements, the court will perceive, by examining the depositions referred to, were made, if at all, some 15 or 16 years since, about the time when the old man's daughter, Mrs. McGill, died, and when her husband, Mr. McGill, was going to return, with her only infant, and with the negro of his deceased wife, to Kentucky; a course of conduct by a father in law, about as well calculated to create a noise in a neighborhood or surrounding community, as any thing else that might occur; and if so made, no person would be more likely to offer to an *inquisitive gossip* some plausible excuse than the son.

The controversy and objections made by Wm. R., and the conduct of the father at his own house, show that there was no recognition by Wm. R. of the right of his father to the negroes. On the contrary, the disapprobation and dissent to the father's course, could not have been more sternly or positively expressed than it was, even to a greater degree than the duty of the son to the father can well be sanctioned. No stranger, with proper feelings and common decency, could have been warranted in saying more or doing more in an old man's house, had such a claim of right or such conduct been pursued towards his property. There is then surely no admission, nor any acquiescence on the part of William, in the assertion of claim, by word or by deed, on the part of the father. This gives rise to the consideration of what is an acquiescence by one in the claim of right to his property by another, so as to impair or affect his right. This doctrine can only exist, and is founded upon the principle, that a party having right to property permits another to hold and enjoy the adverse possession and use thereof, with knowledge on the part of the owner of such adverse enjoyment, &c., without asserting his right thereto. Such conduct on the part of the owner, gives rise to the presumption, that the right is with the possession, and by length of time the possession will ripen into a title, or constitute a bar to the claim of the true owner. What, I ask the court, could Wm. R. Martin have done, or what did he omit to do, more than he did, and has always done, in support and in confirmation of his right and claim to the property? He was in possession; none adverse to his. He did not wish to sell the property. No damages had accrued against his father for slandering his title, nor were any claimed. He could not have done any thing, by any proceeding in law or in equity, which could have added to his enjoyment of the property which he claimed and enjoyed as his own. Such was not the condition of the father. He acquiesced in the adverse possession of the son, and after the claim in his possession set up to the property by the son, it is not a little surprising, if he had any pre-

tence of right to the property, that he did not take some steps to assert it, or at least threaten to do so.

Another circumstance, mentioned by the court, in the decision as being of weight as evidence is referred to, that is as to the claim of the property by the son, being based, not upon a gift, but upon a long and peaceable possession. The court upon looking into the evidence above referred to, will see that he did not so base his claim of right to the property, but that, when he was asked by a witness (old man Swan) what he had to show for the negroes, he replied that he had nothing but peaceable possession for a number of years. Now, interpreting the words of the son as thus replied, we are bound in reason to suppose that he meant to negative the idea that he had a bill of sale or title paper. And suppose that he did mean that he had nothing but a peaceable possession to establish his right, taking into consideration the time he acquired it, and the circumstances of it, including the relation which he bore, &c., to his father, all of which necessarily form a part of the matter to be considered in deciding upon the possession, his show of title. And what presumption, I ask, can be tortured out of the response to prove he had no title or right to the property, and to establish the right yet remaining in the father, or to prove that the father did not intend to give the property to the son, as the law presumed he did, by sending the property home with the son at the time of his marriage, &c., as aforesaid.

Then taking all the statements of the son, and this is all the evidence which has any legal place in the record, and it amounts to nothing more than the statements made by the son, not on oath, and is of all evidence the most dangerous and the most likely to be misunderstood, and least to be relied upon under such circumstances as are shown in this case. It is the testimony of one witness only, the party himself, which is set up and relied upon to outweigh the answer of the same party under oath, responsive to the bill, corroborated by the statements of the father, that the negroes were the negroes of the son, and by other persons who have proven facts sustaining the same, and corroborated also by the sworn inventory of the slaves of the estate of the father, by the plaintiff himself as administrator of the estate, in which no one of the negroes sued for is mentioned.

To be distinctly and clearly understood, I beg leave to state to the court the positions I assume and most confidently rely upon. They are these:

1st. That as the property sued for, is now and has been for twenty years and more in the possession &c. of Wm. R. Martin, used and en-

joyed by him as his own, and which was delivered to him by the father, at the time of his marriage, without any evidence showing, that at the time of delivery, the same was intended, not as a gift by the father, the law premises it was a gift, and it devolves upon the plaintiff to prove by unequivocal evidence, that it was a loan, to entitle him to a decree. 1 Richardson's S. C. Rep. p. 310, 316, Eddings vs. Whaley ; 5 Monroe Rep. 502, 3 ; 4 McCord's 229, 231 Byrd vs. Ward ; 1 Nott & McCord 224, Brashear vs. Blassingham ; ib. 224, Hatton vs. Banks ; 4 Bibb 35 ; 3 Littell 136 ; 3 McCord 207 ; ib. 206.

2nd. That as the plantiff has called upon the defendant to answer the bill of complaint, charging that the negro was loaned and not given to the appellant by his father, the denial of the allegation so made by the complainant, to be taken as true, unless by two witnesses and strong corroborating circumstances, the same is proved to be false. 7 Cranch 69 ; 2 Cond. Rep. 417 ; 3 Wheaton 520 ; 4 Cond. Rep. 311 ; 6 Wheat. 453, 5 ; Cond. Reps. 136 ; 5 Peters 99 ; 1 Wash. C. C. Rep. 230 ; Baldwin's Rep. 494.

3d. That in this case the answers of the co-defendants admitting that their negroes, received from the old man Martin, were received as loans, is no evidence that the negro of William R. was not given to him by his father, unless a father cannot give to one child and loan to another ; and even if a presumption could arise that he would not so act, the fact of such lending to the co-defendants cannot be proved by their answers or admissions in this case, as they are heirs and interested as such in the estate sought to be enlarged by a decree for complainant, as administrator of the estate. 9 Cranch 153 ; 3 Cond. Rep. 319, 5 Monroe Rep. 411, Turner vs. Holman.

4th. That the old man Martin's statements and claim of the property, made in the absence of William, whilst the same was in the possession and use of William, from the time of his marriage, as shown in the record, is no evidence of right or title in the old man to the property, nor was the assessment and payment of taxes by him thereon, any evidence of his right, for the reason that no man can concoct or manufacture evidence for himself against another's rights, either by word or deed. 320 Iredell 210, Green vs. Harris ; 7th new series Ala. Rep:

5th. That in this case there is no evidence in the cause, conducing to show that the answer is not true, except what is in the proof given of his declarations some twelve or eighteen years since, in the presence and hearing of Mrs. Craig, Mrs. Snell and Samuel Martin junior, respecting the loan of his negroes to his children by the old man, and that

if such evidence be entitled to any weight, it and all the other statements which he may have made, of like nature, should be recived with great caution by the court, under the circumstances of this case. See the following authorities: Bottsford vs. Burr 2 John. Ch'y. Rep. 411 ; 4 Monroe Rep. 239 ; Stone &c. vs. Ramsay; 10 Ves. 517, 518, Linch vs. Linch; 2 Barb. Rep. 26, 27, Garrison vs. Akin.

6th. That if the court give any weight to the evidence of the loose conversations of Wm. R. Martin, spoken of by Mrs. Craig and Mrs. Snell, then the court is bound, in law, to treat all he said, though said at different times, as the testimony of only one witness, stated by him not under oath, and that in this case there are no circumstances proven by any legal testimony of any kind whatever, to corroborate the loose declarations alleged to have been made by the defendant, and of course, the answer must prevail.

7th. The testimony or evidence, in corroboration of the answer, independent of the answer, is stronger and entitled to more weight than the evidence given by plaintiff. The law presumes a gift from a parent to the child, when the property at the time of the marriage of the child, is delivered to him by the father, unless at the very time of the delivery, the same is qualified by something going to show the contrary; and in this case, nothing so appears from the record. 1 Richardson's S. C. Rep. Eddings vs. Whaley; 5 Monroe 502 3. And in this case the great length of time the defendant has had and used the property, commencing at least twenty years before the suit, when Hanna was only seven or eight years old, the raising and nursing her children as well as herself as his servants, (an instance or case of the kind rarely, if ever, before known or heard of) coupled with the fact that the old man on two or more occasions, called and spoke of the negroes as Billy's (defendant's) negroes, taken in connection with the fact that the plaintiff himself, acting as an administrator, under oath, did not inventory these negroes as of the old man's estate, under the circumstances, with other facts showing the manifest injustice of wresting from defendant his property, are, all taken together, as above stated, apart from the answer, more than sufficient to counteract the proof of complainant.

P. R. HAYDEN.

Judge BIRCH, delivered the opinion of the court.

The questions of multifariousness and of jurisdiction having been waived in the re-argument of this cause, and nothing appearing in the record from which it can be inferred, that the disposition of the property in question,

was the subject of any statutory provision in the State where it occurred, the general conclusion we have aimed at in reference to the present and kindred cases, renders it unnecessary to attempt any further analysis of the testimony than may be sufficient to demonstrate, that it is apparently incapable of rational and reasonable reconciliation, there *should be* a rule and *there is one,* which, (to some extent at least) supplies the necessity of too distrustingly attempting it.   That rule is furnished in the first and soundest southern adjudication to which we have been referred, being the report of a case, (Carter's Ex'r. vs. Ruland) decided in the supreme court of the State of North Carolina, toward the close of the last century, in which that tribunal lays down the doctrine intelligently and broadly, that "when a man sends property with his daughter, upon her marriage or to his son-in-law, or daughter any short time after the marriage, it is to be presumed *prima facie,* that the property is given absolutely in advancement of his daughter; and when the property is permitted to remain in the possession of the son-in-law for any considerable length of time, as in this case, it will be necessary to prove very clearly, that the property was only lent by the father; and that it was expressly and *notoriously* understood *not* to be a gift *at the time.*   The peace of families and the security of creditors, are greatly concerned in the law being thus settled."

This original rule, as it may perhaps be not inaptly denominated, has been conformed to in many subsequent decisions in the same and other states; 1 Taylor 143; 3 Iredell 210; Geo. Decis. p. 1, 2, 166; 6 Ala. 250; 2 N. and M. 93; 1 McCord 213; 2 Bay, 528; 3 H. and M. 127; unfettered by registery laws, and stands commended in the present case by, perhaps the entire array of reasons upon which it was first predicated. Here, a father was in the habit of sending home with his children, each, upon their marriage, a negro slave, but in what *capacity* or with what *intent* they were thus sent or delivered, except *as inferred in the law;* we hear nothing for years, and then only under such *circumstances,* and apparently for such *purposes* as were not calculated to elicit such mutual, fair and *full* declarations as could alone, (if at all) be recurred to and repeated in such a contest as the present one.   In addition to this and prominent above all, the parties and the witnesses are brothers, and relations, whose interests and whose feelings are excited and antagonistic, thus magnifying the reasons for which the law disfavors controversies so pernicious to morality, so unpropitious of equity in their final results and withal, and above all, so easily and so *naturally* avoidable, by a simple and fair declaration, at a time when, of *all others,* it would seem to be suggested.

Whether the testimony upon the record sufficiently supports the assumption, that the ancestor in this case, continued to pay the taxes upon *the negroes in question*, or whether that too is left in too much doubt and uncertainty to operate as a ground of adverse *title*, at least for the space of two years, if not indeed until the still subsequent period, when the anticipated claims of creditors upon the negro in possession of *another* child, suggested the necessity of thus attempting to strengthen the *general* parental claim of *all* property, need not, we think, be here decided. The testimony is at least explicit, that as soon as it was brought to the knowledge of the defendant, that *that* might be relied upon as a circumstance to overthrow the *prima facie* title resulting from his possession, he too, gave in the slaves for taxation. In any view of the case, however, it seems to us scarcely conceivable or permissible, that if a *prima facie* legal title remitted, as we have seen, from the unconditional, and otherwise, unexplained delivery of the slave, upon the marriage of the son, it could be subsequently modified or affected by what may just as well have been regarded the *gratuitous* payment of taxes upon it as any thing else.

Supposing that the chancellor below, was uninfluenced in rendering the decree reviewing, either by the answers of the other defendants, (distributees,) or the testimony tending to show that loans and *not* gifts, had been made to the other children, (all that being inadmissible as against the defendant in this suit,) but that such testimony was admitted solely for the subordinate purpose which was intimated in the argument of the counsel for the appellee, it is still sufficiently perceivable, that upon the testimony, legitimately entering into the main question, different minds, alike upright and intelligent, might arise at different or diverse conclusions, as to the mere *preponderance* of the evidence, and decree accordingly. This consideration, however, instead of including us as under ordinary circumstances, it would do, to leave the decree undisturbed, but the more conclusively suggests an additional reason for the judicious and self denying application of some *fixed rule*, whereby, to extricate property thus situated from a peril so obvious and otherwise unavoidable.

If in our own State, our predecessors have not gone the entire length of the other southern benches alluded to, they have perhaps approximated it as nearly as the analogy of the respective cases would permit. In Millikin vs. Greer, (5 Mo. 489,) the negroes had been but a year or so out of possession of the ancestor, whereas, in the cases we have referred to, as in the case at bar, the negroes had not only been

sent or delivered to the child, at or about the period of its marriage, without any thing being said "at the time" to otherwise denote the character of the transaction, than as inferred and fixed in the law, but had been suffered to remain, (as is presumable from analogy,) for periods covering the limitation to which the laws restricted the general admission of oral teatimony. It was therefore, consistently enough holden by this court, in the case alluded to, that *such* a possession "did not amount to a gift," but was "strong evidence from which a jury might well presume one;" and although the Judge declared in the same case, that "to constitute a gift there must be words or writing of the presentance, and a delivery of the thing given," that declaration must of course be understood to have been predicated upon, and to apply to, the facts of the case then under consideration, for otherwise it were extra-judicial, and consequently unauthoritative. In any view of the case, therefore, it cannot be binding in a case like the present, where the analogies, and consequently the rule, are intrinsically different.

It is thus inferrable, that the principle difference between the majority of the former bench, and the majority of the present one, consists in part, perhaps, in the relative weight they have respectively attached to the possession of the property, under circumstances like the present, but mainly, doubtless, in the different estimates which they have formed, concerning the aggregate force and effect of the voluminous, circumstantial and conflicting testimony which is found in the record. Without intending therefore, to render an opinion which shall imperatively close the door upon the reception and consideration of even such testimony as appears to have been received and entertained in this case, we have no hesitation in the conclusion, that in all such, the evidence competent to disprove the gift, which the law but resonably implies from such reception and possession as is established here, should be either of the clearest, most direct and uncontradictory character, or if in any sense conflicting, that the aggregate preponderance against the continued denials of an answer, and the *prima facie* title established by the law, should be overwhelming and conclusive to a degree which we are unable to deduce from the record before us.

Judge Ryland concurring in this opinion, the decree of the circuit court is reversed and the bill dismissed.